**William WORTHY, Jr., Appellant,**

v.

**Christian A. HERTER, Secretary of State,**
Appellee.

No. 14806.

United States Court of Appeals
District of Columbia Circuit.

Argued March 20, 1959.

Decided June 9, 1959.

Mr. William M. Kunstler, New York City, with whom Mr. Walter E. Dillon, Jr., Washington, D. C., was on the brief, for appellant.

Mr. F. Kirk Maddrix, Atty., Department of Justice, with whom Mr. Samuel L. Strother, Atty., Department of Justice, was on the brief, for appellee.

Before Mr. Justice BURTON, retired,* PRETTYMAN, Chief Judge, and WILBUR K. MILLER, Circuit Judge.

PRETTYMAN, Chief Judge.

Our appellant, William Worthy, Jr., was a newspaperman duly accredited by the *Afro-American* Newspapers, the *New York Post,* and the Columbia Broadcasting System. In 1957 he applied for renewal of a passport originally issued to him in 1955. The passport contained a restriction stating it was not valid for travel to five named areas under control of authorities with which the United States does not have diplomatic relations, including the portions of China, Korea and Viet Nam under Communist control; and also a restriction against travel in Hungary. After various proceedings Worthy was asked whether he would make a commitment to abide the restrictions. He declined to do so, and the renewal was refused. The background for the refusal was that when the passport was originally issued it contained the same restrictions but Worthy nevertheless traveled extensively in both Communist China and Hungary. The refusal of the passport rested in no part upon Worthy's personal beliefs, writings or character. It was an application of the Secretary of State's general policy of refusing Government sanction to travel by United States citizens in certain areas of the world, presently under Communist control and deemed by him to be trouble spots.

We note immediately that the point here presented in no wise resembles the matter decided by the Supreme Court in Kent v. Dulles.[1] There the Court held that the Secretary refused passports because of the beliefs and associations of the applicants and that he had no statutory authority to refuse on such grounds. In the case at bar no beliefs, associations, or personal characteristics are involved. Nor is this a case in which the Secretary has proposed a restriction upon a passport for reasons of internal security, i. e., protection against internal subversion. The factors here are political and military conditions in certain areas of the earth.

Worthy makes four points. 1. He says the right to travel is a constitutional right and may be abridged only when there are overriding considerations of the public safety. 2. The Secretary lacks statutory authority to deny a passport to prevent travel in these countries. 3. Alternatively, to the extent the refusal rests upon Executive power over foreign relations, it is still subject to applicable constitutional provisions, and the reasons given by the Secretary do not warrant this abridgment. 4. The refusal is an abridgment of the freedom of the press.

Worthy says, correctly, that the denial of a passport, under the statutes of today, must be justified as a denial of a right to travel; and he says, also correctly, that the right to travel is protected by the Constitution, being a part of the right to liberty. But the simple, succinct phrases of the Bill of

---

* Sitting by designation pursuant to Sec. 294(a), Title 28 U.S.C.

[1]. 1958, 357 U.S. 116, 78 S.Ct. 1113, 2 L. Ed.2d 1204.

Rights, indestructible protections to some of the fundamentals of our way of life, can be, and often are, expanded by rhetorical inflation beyond all semblance to the realities with which they were meant to deal. The right to travel is a part of the right to liberty, and a newspaperman's right to travel is a part of the freedom of the press. But these valid generalizations do not support unrestrained conclusions. For the maintenance and preservation of liberty, individual rights must be restricted for various reasons from time to time. In case of a clear and present danger to the national security, even so generally unrestrictable a right as speech can be restricted. In case of a reasonably anticipated threat to security or to law and order, many acts by individuals can be restricted. An assembling mob bent on disorder can be dispersed. A man with a contagious disease can be locked in his house. Potentially dangerous actions must be restricted in order to prevent harm to others. So we have sanitation, fire, building and speeding regulations.

Liberty itself is inherently a restricted thing. Liberty is a product of order. There is no liberty in anarchy or in chaos. Liberty is achieved by rules, which correlate every man's actions to every other man's rights and thus, by mutual restrictions one upon the other, achieve a result of relative freedom. The mere day-to-day maintenance of the order which insures liberty requires restrictions upon individual rights. Some actions, neither harmful nor potentially dangerous, must be restricted simply for the sake of good order in the community. So we have parking, traffic and zoning regulations and rules of court.

No individual may take whatever he pleases, and so all others are free to enjoy their possessions. One man may not assault another with whom he disagrees, and this restriction protects the freedom of all to speak and live peacefully. One may not spread vicious lies about another, and so all are free to enjoy their good reputations. Every person is forbidden to join with his competitors to drive another person out of business, and so all are free to pursue their trades and buy products at reasonable prices. Everybody's liberty is restricted by prohibitions against driving recklessly, spreading disease, and leaving hidden dangers on property, and so the whole community is free to enjoy health. One cannot trample his neighbor's flower beds, or even trespass on his lawn. Even in a neighborhood community every man's right to roam is drastically restricted. A man who asserts his own uninhibited freedom to go where he pleases is a menace and is quickly put in his place. He may not park where he pleases, or drink where he pleases, or spit where he pleases. In the community the police take care of these matters, and in so doing the officers act as servants of the rest of the community; they are the government.

Freedom to worship as each one chooses is restricted in some ways. Worship by human sacrifice is forbidden. A member of one religion cannot interrupt the services of another religion in order to worship in his own way. Through this restriction all have freedom to worship as they choose.

Freedom of the press bears restrictions. It does not include the right to publish what another has registered with the copyright office. Merely because a newsman has a right to travel does not mean he can go anywhere he wishes. He cannot attend conferences of the Supreme Court, or meetings of the President's Cabinet, or executive sessions of Committees of the Congress. He cannot come into my house without my permission, or enter a ball park without a ticket of admission from the management, or cross a public street downtown between crosswalks. He cannot pass a police cordon thrown about an accident, unless he has a pass from the police. A newsman's freedom to travel about is a restricted thing, subject to myriad limitations.

The peace-loving have rights. Those who recognize the fundamental necessities of liberty as a delicate product of

order have power to protect themselves and their liberty. The liberty of everyone, law-abiding citizen and criminal alike, is involved in the maintenance of order and is threatened when disorder brings either the necessity or the opportunity for force to replace correlated rules of conduct. Such a threat may easily arise from conditions in foreign lands. The people have a right to protect their liberty, no matter whence the threat.

Indeed it is quite clear that those who cry the loudest for unrestricted individual freedom of action would be the loudest in bemoaning their fate if their plea were granted. The same release from constituted authority would set free persons so powerful, so ruthless, so bent on autocratic control that no newsman would have any liberty whatever. The customary prompt transformation of unrestrained liberty into dictatorship is one of the poignant lessons of history. These pleas for unrestricted individual freedom seem to us to be made upon a firm assumption that not too many people will be granted such liberty and not too much liberty in any event. Worthy himself says he does not plead for an unrestricted liberty for all people. His plea is for his own liberty to do what he happens to choose.

■ So we conclude on the point that the right to travel, like every other form of liberty, is, in our concept of an ordered society, subject to restrictions under some circumstances and for some reasons.

The next questions are what restrictions are here sought to be imposed by the Secretary and why he seeks to impose them.

Worthy seeks an unrestricted passport, so that he may travel anywhere in the world. He wishes especially to enter certain countries, now under Communist control, which, like most others, require him to possess a valid United States passport. He advised the Board of Passport Appeals he had written Premier Chou En-lai that he sought "full information about any and all news stories, especially stories that involve the risk of war, as is the case with current Chinese-American issues over Taiwan, Quemoy and Matsu." The Secretary will not issue him a passport unless Worthy says he will not enter these designated countries. Thus Worthy is now free to travel in public places in the United States, Canada and Mexico, and if he agrees to the restrictions he will be free to travel in places open to foreigners in all countries which will grant him visas, except those named by the Secretary. The quantum by which Worthy's freedom has been reduced is the area of places open to foreigners in those of the six named countries which might grant him visas. No restrictions are proposed upon Worthy's thinking or writing. The restrictions proposed are on his physical presence in specified zones in foreign countries. They are restrictions upon acts, i. e., travel.

The Secretary has given two separate but related reasons for this reduction of Worthy's freedom: (1) The areas named are potential or actual "trouble spots", where the presence of American citizens may place them in danger and further irritate our relations with the named countries and their allies. (2) The presence of American citizens in these areas and the official approval of their presence there will impede the execution of American foreign policy in relation both to these countries and to other countries.

■ The facts which caused the Secretary to designate these places and to refuse official sanction of travel therein are shown us by the Secretary. Indeed they are established by many current events; they appear almost daily upon the front pages of the newspapers; they have been declared repeatedly by the President, his predecessors, and the Congress. We need not catalog them. The Korean difficulty with Communist China is still in the armistice stage, not finally settled. All trade with that part of China is prohibited. The situation in respect to Formosa and the small offshore islands, where we have a treaty of mutual defense, fluctuates in tensity.

We oppose Communist China's membership in the United Nations. American citizens are held in hostage in that country. The reasons underlying the restriction on travel in Hungary are less numerous but amply sufficient. Unless almost the whole of our foreign policy and the titanic domestic burdens being presently borne by our people are devoid of factual foundation, there is presently in the world a deadlock of antagonistic forces, susceptible of erupting into a fatal cataclysm. The capacity of incidents arising from the conduct of individuals to ignite that conflagration is well proven. Worthy says the reasons averred by or available to the Secretary are insufficient to support the restriction of his passport. We hold they are ample.

Designations of restricted areas are made from time to time by the Secretary and thereafter are frequently withdrawn by him. Such has been a customary practice. For example, travel to Hungary was restricted on December 21, 1949, and the restriction was lifted upon the release of Robert Vogeler. The same thing happened in Czechoslovakia in 1951 in connection with the Oatis incident.

█ We think the designation of certain areas of the world as forbidden to American travelers falls within the power to conduct foreign affairs. The bare determination that certain areas outside this hemisphere are trouble spots, or danger zones, is a phase of "foreign affairs". Such a determination involves information gleaned through diplomatic sources and channels, and a judgment premised in large part upon foreign policy. The grounds upon which the President would make such a designation are foreign considerations, foreign affairs and policy. Indeed it would seem that such a restriction is in and of itself a foreign policy. It is at least an instrument of foreign policy. It depends upon this Government's attitude toward a foreign power and on that power's attitude toward us. Its locale is foreign territory. The assistance the Congress requires [2] the President to afford an American citizen in trouble abroad is a phase of "foreign affairs". The instrumentalities he must use to fulfill the congressional mandate are diplomatic, or foreign-service consular. A decision on the part of the President to prevent, if possible, the necessity for calling into play his diplomatic instrumentalities and the use of his powers—persuasive or compulsory—upon a foreign nation is a phase of "foreign affairs". The selection by him of the means to be used in a given such case rests in large part upon policy, obviously foreign policy.

█ If then, the designation of a foreign area as a potential trouble spot is a "foreign affair" and the extrication of a citizen from trouble in a foreign country is a "foreign affair", is the refusal of the Executive to accord Government approval for a citizen to travel in such a designated area also a "foreign affair"? We think it is. The essence of the conduct of foreign affairs is the maintenance of peace, the prevention of war. The Constitution places that task of prevention in the hands of the Executive. The two correlative powers, to conduct war and to prevent war, are Executive functions under our Constitution.

Of course the prevention of clashes with foreign governments embraces diplomatic negotiations with those govern-

2. 22 U.S.C.A. § 1732: "Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress."

ments. But, as a matter of hard, practical reality, it also involves restrictions upon acts of our own citizens which may reasonably be foreseen as breeding clashes. History establishes that either the behavior or the predicament of an individual citizen in a foreign country can bring into clash, peaceful or violent, the powers of his own government and those of the foreign power. This is a fact, not a theory. The nub of the problem at bar revolves about a fact, not a suppositious theorem. The acts of individuals do cause clashes; the prevention of such acts does prevent clashes. Such clashes, whether diplomatic or military, involve "foreign affairs". The plight of airmen who have crossed borders, and the tense crises thereby created, are recent common knowledge. Surely the Executive can forbid such crossings by our airmen, commercial or private as well as military.

 We think that, if the Executive foresees that the presence of American citizens in a designated foreign area may, by reason of military or political conditions there, evolve into, or be the occasion of, a clash, diplomatic or military, with a foreign government, his power in respect to foreign affairs includes power to refuse to sanction the travel of American citizens in that area. To hold the contrary would be to hold that the protection of the peace against American-caused incidents in foreign countries is outside the realm of foreign affairs. Such latter holding would be both illogical and unrealistic. In foreign affairs, especially in the intimate posture of today's world of jets, radio, and atomic power, an individual's uninhibited yen to go and to inquire may be circumscribed. A blustering inquisitor avowing his own freedom to go and do as he pleases can throw the whole international neighborhood into turmoil. Worthy's avowed intent is to seek "especially stories that involve the risk of war".

 The general principles governing the power of the Executive in foreign affairs are discussed by the Supreme Court in Perez v. Brownell; [3] Chicago & Southern Air Lines v. Waterman S. S. Corp.; [4] and American Communications Ass'n, C.I.O. v. Douds,[5] especially in Mr. Justice Jackson's concurring opinion.[6] We dealt with them at length in Briehl v. Dulles.[7] We think we need not here venture upon another extensive examination of that phase of our problem. It is settled that in respect to foreign affairs the President has the power of action and the courts will not attempt to review the merits of what he does. The President is the nation's organ in and for foreign affairs.[8]

Worthy says that a denial of the right to travel to certain places cannot be based on consideration of foreign policy, because foreign policy is vague and fluctuating. This contention ignores the President's undisputed power to abridge various other rights on foreign policy grounds. The President may recognize foreign governments, make executive agreements,[9] and grant, deny or modify licenses for international air transportation. When the President exercises his authority in any of these fields, his decision may seriously affect the freedom of an American, "outside areas of plainly harmful conduct, * * * to shape his

3. 1958, 356 U.S. 44, 78 S.Ct. 568, 2 L. Ed.2d 603.

4. 1948, 333 U.S. 103, 68 S.Ct. 431, 92 L. Ed. 568.

5. 1950, 339 U.S. 382, 70 S.Ct. 674, 94 L. Ed. 925.

6. Id. at page 422, 70 S.Ct. at page 705.

7. 1957, 101 U.S.App.D.C. 239, 248 F.2d 561.

8. Chicago & Southern Air Lines v. Waterman S.S. Corp., 333 U.S. at pages 109–111, 68 S.Ct. at pages 435–436.

9. United States v. Pink, 1942, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796; United States v. Belmont, 1937, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134.

own life as he thinks best, do what he pleases, go where he pleases." [10]

The nature of the power of the President in the conduct of foreign affairs is well illustrated by the Waterman case, supra. The President's order to modify a license for overseas air transportation was in accordance with Section 601, Title 49 U.S.C.A. That section provides that such licenses "shall be subject to the approval of the President." Congress laid down no standards or guide for him to follow. The President's justification for the change was that he had reached his decision "because of certain factors relating to our broad national welfare and other matters for which the Chief Executive has special responsibility * * *." [11] The Supreme Court held that the President's decision was guided by his foreign policy and was immune from judicial review. The dissenting Justices agreed with this proposition but thought that procedure before the Civil Aeronautics Board should be reviewable.

▆▆ Worthy argues that the Secretary does not have statutory power to designate restricted geographical areas. We think, as we have indicated, that the President has ample power under the Constitution itself. His delegation to the Secretary is complete. [12] But, if the power to act rests upon statutes, we think the existing ones are clearly sufficient. Section 1185(b), Title 8 U.S.C.A., [13] provides that, while a proclamation of national emergency is in force, [14] "it shall, except as otherwise provided by the President, and subject to such limitations and exceptions as the President may authorize and prescribe, be unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid passport." The President delegated this authority to the Secretary by Proclamation No. 3004. [15] On this point we appeared, in Briehl v. Dulles, supra, to be in agreement. In his dissenting opinion Judge Bazelon said, referring to Proclamation No. 3004: "Thus read, it grants the Secretary discretion of the type already exercised in his existing travel control regulations, namely, to determine which parts of the world can be visited by Americans only if they have passports, but not to determine which Americans are to receive passports." [16] The 1926 Act contained the unequivocal provision: "The Secretary of State may grant and issue passports * * *." [17] The Supreme Court said in Kent v. Dulles: [18]

"Under the 1926 Act and its predecessors a large body of precedents grew up which repeat over and again that the issuance of passports is 'a discretionary act' on the part of the Secretary of State. The scholars, the courts, the Chief Executive, and the Attorneys General, all so said."

If the Secretary has any discretion it seems to us it must include a discretion to prevent trouble when he reasonably foresees trouble. Without a preventive discretion, he has no discretion of any realistic content. Reasonable basis for the Secretary's anticipation of possible involvement appears in ample measure in this case. So we think the statutes, if they have any meaning at all, include the power to do what the Secretary did in the case before us.

The *in terrorem* argument that to sustain the Secretary's power in this case is to confer upon him an unrestricted dis-

10. Chafee, Three Human Rights In the Constitution of 1787 (1956), p. 197, quoted in Kent v. Dulles, 357 U.S. at page 126, 78 S.Ct. at page 1118.

11. 333 U.S. at page 111, 68 S.Ct. at page 436.

12. Proc.No. 3004, 67 Stat. c. 31 (1953); Exec.Order No. 7856, 3 Fed.Reg. 681 (1938).

13. 66 Stat. 190 (1952).

14. See Proc.No. 3004, supra note 12.

15. Ibid.

16. 101 U.S.App.D.C. at page 259, 248 F. 2d at page 581.

17. 44 Stat. 887, 22 U.S.C.A. § 211a.

18. 357 U.S. at pages 124–125, 78 S.Ct. at pages 1117–1118.

cretion to grant or to refuse passports is wholly unimpressive. He has not exercised such a discretion. He does not claim it, and we are not considering any such power in the remotest degree. The claimed power, so far as this case is concerned, is narrow and clearly delineated.

It is said that many of the incidents involved in the reported court cases dealing with foreign affairs were in time of war. But foreign affairs involve more than wars, and the President's powers over foreign affairs are not only war powers. As a matter of fact these are two separate powers in the Constitution. And, as a further matter of fact, governments have many more dealings with each other and problems concerning each other in peacetime than they do in wartime. Not only so, but, as we have already emphasized, the duty of the President to prevent war is as important as is his power to conduct one.

Worthy errs when he assumes that the Secretary has forbidden him to travel at all or that the action "is tantamount to imprisoning him." Worthy, so far as this record shows, can have a passport to travel all over the world except in certain designated areas. He is in no sense imprisoned, except in the same rhetorical sense, although in less degree, that man is imprisoned because he is earthbound.

Worthy says situations which demand curtailment of constitutional rights must be of an exceptional and severe emergency nature—"clear and present danger", "gravest imminent danger", etc. Several comments may be made. In the first place the nature of the right and the nature of the restriction are important. As we have already pointed out, the right here involved is not a right to think or speak; it is a right to be physically present in a certain place. The basis of the restriction is not personal but is the military and political situation in the designated areas. In the second place there is a grave, clear and present danger, as we have indicated. When a gunman points a loaded gun, one need not await the report from a shot to know that danger is clear and present. The contention that there is no grave danger involved in the wanderings of uninhibited American newsmen in China or in Hungary today reflects an unawareness of realities. In the third place the Constitution puts in the President the authority to evaluate the military and political exigencies in foreign countries. The courts are the least able of all organs of government to make such evaluations, and they are wholly without authority to make them.

Worthy says the presence of Americans, at least of American newsmen, in the restricted areas would better our foreign relations rather than worsen them. This is an argument he should make to the President or the Congress. The authority to determine what would and what would not better our foreign relations is not vested in individual citizens, even though they be newsmen, any more than authority to declare a damaged wall in a newsman's home town dangerous or not dangerous is vested in him. The Fire Chief determines that condition and enforces his conclusion.

To order the Secretary of State to do something, because we believe it would be better for our foreign relations than his plan, would be a gross usurpation of Executive powers. Judgment on what course of action will best promote our foreign relations has been entrusted to the President, not to the courts, journalists, scholars, or even "public opinion". He makes his decision with the aid of the Department of State, a large organization with stations throughout the world, as well as on the basis of information received from all other parts of the Executive branch. We, if we had all this information, might reach a different decision. But the Constitution has wisely placed that burden in the hands of one who must justify his decisions before the electorate.

The judgment of the District Court is

Affirmed.