Staughton LYND, Appellant,

v.

Dean RUSK, Secretary of State, Appellee.
Jane WITTMAN, Appellant,

v.

SECRETARY OF STATE, Appellee.

Nos. 20448, 20790.

United States Court of Appeals
District of Columbia Circuit.

Decided Dec. 20, 1967.

Mr. David Carliner, Washington, D. C., with whom Messrs. Edward J. Ennis, Stephen W. Porter and Jack Wasserman, Washington, D. C., were on the brief, for appellant in No. 20,448.

Mr. Leonard B. Boudin, Washington, D. C., with whom Mr. David Rein, Washington D. C., was on the brief, for appellant in No. 20,790.

Mr. Robert L. Keuch, Attorney, Department of Justice, with whom Asst. Atty. Gen., Yeagley, Messrs. David G. Bress, U. S. Atty., and Kevin T. Maroney, Attorney, Department of Justice, were on the brief, for appellee.

Before BAZELON, Chief Judge, LEVENTHAL and ROBINSON, Circuit Judges.

LEVENTHAL, Circuit Judge:

The present cases raise the question whether and to what extent the Secretary of State may enforce compliance with area restrictions on foreign travel, following his determination that travel by United States citizens to five designated countries—China, Cuba, North Korea, North Vietnam, and Syria—would be inimical to the nation's foreign relations.[1]

In Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), the Supreme Court held that the Passport Act of 1926, 22 U.S.C. § 211a (1964),[2] authorizes the Secretary to make such a determination and to restrict the validity of United States passports for travel in these countries. United States v. Laub, 385 U.S. 475, 87 S.Ct. 574, 17 L.Ed.2d

1. See Public Notices 256, 257, 258, 259, 32 Fed.Reg. 4140 (1967); Public Notice 270, 32 Fed.Reg. 9175 (1967).

2. "The Secretary of State may grant and issue passports * * * under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify such passports." The President has delegated his rule-making authority under this statute to the Secretary, Exec. Order No. 11295, 3 C.F.R. 1966 Comp. at 138.

526 (1967), however, held that travel to these forbidden places without a specially validated passport has not been made a criminal offense by Congress.

The question that remains is whether the Secretary may withhold or revoke a passport if the person declines to give assurances that he will not travel to the designated areas.

Congress has not given the Secretary any power to proscribe travel. His power is limited to controlling the issuance of passports and granting of diplomatic facilities. However we must recognize, as the Supreme Court did in *Zemel*, that denial of a passport has the undoubted practical consequence of effectively limiting travel. This may also be a legal consequence, since Section 215(b) of the Immigration and Nationality Act, 8 U.S.C. § 1185(b) (1964), which is operative because of the Presidentially declared national emergency,[3] makes it a crime to leave the country without a passport—except for travel to certain areas not within the ambit of appellants' cases.[4] Taking account of these consequences and the constitutional dimension of the right to travel, the Secretary's power over passports must be construed in such a way as to minimize interference with legitimate travel.

Appellant Lynd's difficulties with the Passport Office arise out of his January 1966 self-styled "fact-finding and investigating" mission to North Vietnam to "clarify the negotiating position of the other side." He obtained a North Vietnamese visa in Czechoslovakia. Appellant Wittman, in an earlier and more modest venture, visited Cuba in 1964 with a group of American students. One of her goals was "to study the educational system." On their respective returns to the United States each appellant was informed that his passport had been "tentatively withdrawn." They individually pursued administrative remedies within the Passport Office, and hearings were held.

At Lynd's hearing two questions of chief importance were posed. He was asked:

> If you are issued a passport, will you use the passport issued to you to travel in violation of the conditions or restrictions contained therein, or any subsequent restrictions imposed upon the use of the passport by the United States Government acting through the Secretary of State or other responsible official?

Lynd replied: "My answer to that question is no." He was then asked this question, which was put forward as embodying a "subtle difference."

> If you are issued a passport will you travel in violation of the restrictions or conditions contained in the passport, or any subsequent restrictions or conditions imposed upon the travel of a United States citizen by the United States Government acting through the Secretary of State or other responsible official with or without using the passport?

Lynd's answer was that he agreed not to use the passport in areas restricted by the Secretary, but reserved the right to travel to those areas without using a passport.[5]

The record makes clear that the Secretary's action was based on Lynd's refusal to give a categorical "no" reply to this second question, phrased as a failure to provide assurances that he would not again violate area restrictions

---

3. Proclamation No. 3004, 3 C.F.R. at 180 (1949–53 Comp.).

4. The Secretary has broadened somewhat the travel vistas of those without passports by issuing regulations, 22 C.F.R. § 53.2(b) (1967), exempting journeys in the Americas (excluding Cuba) from the operation of this criminal law. We understand, however, that foreign countries have visa requirements that greatly limit even this travel.

5. Lynd amplified that he considered himself "an open and honest person, not an indiscriminate lawbreaker," and that he was asserting his constitutional right to travel as embracing a freedom of speech, a need in the interest of peace for constructive "contact between persons separated by war."

in his passport. Miss Wittman was asked similar questions. It suffices here to say that she refused to give any assurances as to her travel "with or without a passport." The hearing officer recommended final withdrawal of their passports pursuant to a regulation, since revoked, which authorized refusal of passport facilities on a finding that the traveler's "activities abroad would * * * (b) be prejudicial to the orderly conduct of foreign relations; or (c) otherwise be prejudicial to the interests of the United States," 27 Fed.Reg. 344 (1962), formerly codified as 22 C.F.R. 51.136 (1965). This recommendation and accompanying findings were adopted by the Director of the Passport Office, and subsequently this decision was upheld by the Secretary [6] following an appeal to the Board of Passport Appeals. Suits were brought for injunctions against the Secretary's revocation of the passports and for declaratory relief. Summary judgment was granted to defendant in both cases.

### I

We begin our consideration of the issues by taking note of the complication that the regulation pursuant to which the Secretary acted has been withdrawn, and more narrowly drafted provisions substituted in its stead. These new regulations specifically provide that someone who has traveled "to, in, or through a restricted country or area without a passport specifically validated for such travel" may be subject to a passport revocation proceeding and may be refused a new passport "until such time as the Secretary receives formal assurance and is satisfied that the person will not again travel in violation of the travel restrictions." 31 Fed.Reg. 13544, October 20, 1966, codified as 22 C.F.R. §

51.74 (1967). Appellant Lynd, while recognizing that the new regulations are narrower, has mounted an extensive attack on the old regulation, arguing that it was both unconstitutionally vague and unauthorized by statute. We see little point in providing an academic ruling on the vagueness of the rescinded regulation. In view of the refusal to give "assurance" there is no basis for suggesting that the result would be different if the case were reconsidered under the new regulation.[7] No substantial rights are being disregarded for, as appellant Lynd concedes (Brief, p. 19 n. 3), "no purpose would be served in remanding this case for further proceedings under the new regulation in view of the fact that the premise of the appellee's decision would remain unchanged." In the circumstances, we think it appropriate to consider the question whether the Passport Act of 1926 authorizes the Secretary to withhold or revoke passports for failure to provide appropriate assurances concerning travel to designated areas.

### II

The principles that in our view govern these cases may be summarized as follows: We think Congress has authorized the Secretary to require an applicant for a United States passport to refrain from using it in a restricted area and indeed from transporting it into a restricted area. Although the Secretary has the authority to decline to issue a passport when the traveler's sole purpose is to journey to restricted areas, he cannot extend that authority so as to withhold a passport when the applicant seeks to travel to a non-restricted area for any of the myriad purposes—business, tourism, scholarship—which make travel part of the "liberty" the Constitution protects. The passport must be issued to such a

---

**6.** The Secretary withdrew Lynd's passport, and requested its surrender, on the ground of Lynd's admitted travel to North Vitnam notwithstanding the area restrictions in his passport, his refusal to provide assurances that he would not again violate the area restrictions in his passport, and the Secretary's "conclusion that future travel by you to North Viet-

Nam in violation of the area restrictions in your passport would be prejudicial to the orderly conduct of foriegn relations or otherwise be prejudicial to the interests of the United States."

**7.** The new regulations make explicit that any ground justifying a refusal to issue a new passport also justifies revoking one already issued. 2 C.F.R. § 51.71 (1967).

traveler even though while outside the United States he plans both to travel to a non-restricted area and also to visit a restricted zone. However, the Secretary may take reasonable steps to assure that any travel into or within a restricted area is done without a passport.

We shall first present the analysis underlying these principles, and subsequently (in Part III) apply them to the cases before us.

1. The Secretary maintains that both these cases must be affirmed on the authority of Worthy v. Herter, 106 U.S. App.D.C. 153, 270 F.2d 905, cert. denied 361 U.S. 918, 80 S.Ct. 255, 4 L.Ed.2d 186 (1959). It is difficult to tell whether in Worthy the court had before it the contention urgently pressed by Lynd, that the Secretary has power to set area restrictions only for travel using a passport and is powerless to hinder travel without a passport. In any event, we cannot accept the Worthy ruling as dispositive. In Worthy the court supported its holding on two principal grounds. The first was the inherent foreign affairs power of the executive. But in the cases before us the Secretary does not press any claim that he has an "inherent" authority, and contends his action is valid under the Passport Act of 1926. It is not insignificant that the Zemel opinion, supporting the Secretary, did not rely on an inherent authority. We think any claim of inherent authority would fall afoul of the Supreme Court's warning in Kent v. Dulles, 357 U.S. 116, at 129, 78 S.Ct. 1113, at 1120, 2 L.Ed.2d 1204 (1958), that as freedom to travel is part of the "liberty" protected by the Fifth Amendment, "if that 'liberty' is to be regulated, it must be pursuant to the law-making functions of the Congress." In deciding in the alternative that there was statutory basis for the Secretary's action Worthy relied significantly though not exclusively on Section 215(b) of the Immigration and Nationality Act. The

unanimous opinion in United States v. Laub, 385 U.S. 475, 87 S.Ct. 574, 17 L. Ed.2d 526 (1967), completely undercuts the significance of Section 215(b).

2. Consequently, we face the issues anew. Kent v. Dulles, supra, and Zemel v. Rusk, supra, make plain that the language of the Passport Act of 1926 is broader than the authority it confers. That Act must "take its content from history: it authorizes only those passport refusals and restrictions 'which it could fairly be argued were adopted by Congress in light of prior administrative practice.'" Zemel v. Rusk, 381 U.S. 1, at 17–18, 85 S.Ct. 1271 at 1281.

In upholding the Secretary's authority both to impose area restrictions and to refuse to validate passports for travel in the restricted area, the Zemel opinion stressed that in the absence of contrary indication in the legislative history, the broad language of the 1926 Act and its forerunners served to constitute approval of a practice going back to the War of 1812. The Court stressed the Secretary's long and consistent administrative interpretation of the statute as empowering him to impose these restraints. 381 U.S. at 10–11, 85 S.Ct. 1271. The Court relied on Exec.Order No. 7856, 3 Fed.Reg. 681, 687 (1938),[8] the basic delegation of executive rule-making authority under the 1926 Act to the Secretary of State, which provided:

The Secretary of State is authorized in his discretion to refuse to issue a passport, to restrict a passport for use only in certain countries, to restrict it against use in certain countries, to withdraw or cancel a passport already issued, and to withdraw a passport for the purpose of restricting its validity or use in certain countries.

This assertion of authority, insofar as area restrictions are concerned, is reflective of what has in fact been the reasonably consistent State Department prac-

8. This Executive Order was revoked in 1966, Exec. Order 11295, 3 C.F.R. 1966 comp. at 138. Plainly the revocation was not intended to withdraw the assertion of authority, nor does it undermine the inference of previous legislative assent to the assertion.

tice both before and after the issuance of this Executive Order. Passports were regularly denied to applicants when their stated travel destination was an area that the Secretary had restricted. Passports were denied for trips to Belgium in 1915, for all nonemergency European travel during World War I, for Ethiopia. in 1935, and for Spain in 1937.[9] These refusals were more than mere warnings of the inability to provide normal diplomatic facilities. They were designed to keep Americans out of the troubled areas.[10] In light of this history, significant under *Zemel* and *Kent* for construction of the Secretary's discretion under the 1926 Passport Act, we must reject appellants' contention that the Secretary has no power whatever to refuse a passport because of the applicant's intended destination.

3. The power of the Secretary to act with reference to a traveler's destination serves not only as a ground for refusal to issue a passport, but also, we think, as a basis for revoking a passport.[11] A passport is not like a license, where the holder's legitimate reliance on its continuation may mandate vesting him with special protections against revocation. Citizens do not stand on different footings in asserting the right to travel merely by virtue of having received a passport in connection with prior trips abroad.

4. We are aware that at the time the administrative practice was jelling, the refusal to issue a passport did not have the legal consequence of prohibiting travel into restricted areas. It was not illegal to leave the country without a passport until 1941, except for a short period

during World War I.[12] But the primary objective of the Secretary in refusing passports to restricted areas was to stop the travel to those areas. The Secretary's power—historically asserted and exercised—was not revoked merely because it is now reinforced by Section 215 of the Immigration and Nationality Act, in time of war or national emergency.[13]

5. The difficulty arises, however, because the power asserted by the Secretary in his regulations is not limited to a denial of a passport to go to a restricted area. If the Secretary denies a passport altogether—because he is not "satisfied" that the traveler will refrain from going to a restricted area—this amounts to a prohibition not only of travel to restricted areas, but also of most other travel. These travels stand on different constitutional planes.[14] To keep travelers from five countries, the Secretary bars them from visiting over one hundred others. We think this consequence is not permissible under the statutes thus far enacted and the cases thus far decided.

▮▮▮ The 1958 ruling in Kent v. Dulles, *supra,* is our touchstone. It establishes not only that the right to travel is protected by the Fifth Amendment, but that statutory limitations will be strictly construed. "Where activities or enjoyment, natural and often necessary to the well-being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute them," 357 U.S. at 129, 78 S. Ct. at 1120. Mindful of the consequences to the citizen, the Court was unwilling to find that the broad language of the

9. See III G. Hackworth, Digest of International Law, 526–533 (1942).

10. See Riesman, Legislative Restrictions on Foreign Enlistment and Travel, 40 Colum.L.Rev. 793, 807 (1940).

11. This consequence is now expressly set forth in 22 C.F.R. § 51.71 (1967).

12. The pre-1926 forerunner of the present Section 215 of the Immigration and Nationality Act was operative only from 1918 to 1921—Act of May 22, 1918, 40

Stat. 559, Act of March 3, 1921, 41 Stat. 1359.

13. As already noted, however, travel in the Americas is permitted without passports. Apparently a trip outside the Americas can be made legally without a passport as long as the traveler sojourns for sixty days before leaving for a part of the world outside the Western Hemisphere. See 22 C.F.R. § 53.2 (1967).

14. See Zemel v. Rusk, *supra.*

1926 Act authorized the Secretary to take actions not legitimized by an administrative practice which Congress could fairly be said to have deliberately accepted.[15] The past administrative practice of the State Department (see point 2) justifies the refusal to issue a passport sought for the sole purpose of travel to a restricted area. But we see no substantial evidence that Congress approved the achievement of that objective by prohibiting travel to non-prohibited areas. When Congress approved denial of a passport in 1926 the passport was not, as today, an exit permit required by law for nearly all foreign travel. If the sole travel planned by the applicant is to an area reasonably restricted by the Secretary as off limits to passport holders, and hence carries no plenary constitutional protection, Congressional approval of the denial of a passport to undertake that travel is fairly inferred. But we see no comparable basis for inferring that Congress has given the Secretary the authority to deny legitimate, constitutionally protected travel, merely because that is a technique which provides greater assurance of hindering travel to designated areas.

Gleaning intention from Congressional silence is under the best of circumstances an elusive task. Our difficulties are magnified here, however, because we do not deal with a single Congressional enactment that is and has been periodically reenacted or revised.[16] The area of travel control is criss-crossed by three statutes, the Passport Act of 1926, 22 U.S.C. § 211a (1964), Section 215(b) of the Immigration and Nationality Act, 8 U.S.C. § 1185(b) (1964), and 18 U.S.C. § 1544 (1964),[17] which were drafted at different times, for different purposes, and without an overall design. They have been the source of considerable confusion, inside the State Department as well as in Congress and among the public,[18] as to the ways in which the travel rights of Americans can be limited by the Secretary's exercise of discretion. Although Congress has approved administrative action intended to limit travel to restricted areas through the means of restricting passports, as appears from *Zemel,* it has not made travel to restricted areas a crime and added possible deprivation of liberty as a sanction for achieving this objective. United States v. Laub, *supra.* Indeed, it has several times

15. Cf. Greene v. McElroy, 360 U.S. 474 at 506, 507, 79 S.Ct. 1400, at 1419, 3 L.Ed. 2d 1377 (1959), that since "decisions of great constitutional import and effect" must not be "relegated by default to administrators who, under our system of government, are not endowed with authority to decide them," delegation may not be inferred from mere acquiescence or implied ratification but must be made explicit, and "it must be made clear that the President or Congress, within their respective constitutional powers, specifically has decided that the imposed procedures are necessary and warranted and has authorized their use."

16. Compare Cammarano v. United States, 358 U.S. 498, 508–509, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959); Massachusetts Mut. Life Insurance Co. v. United States, 288 U.S. 269, 273, 53 S.Ct. 337, 77 L.Ed. 739 (1933).

17. In relevant part: "Whoever willfully and knowingly uses or attempts to use any passport in violation of the conditions or restrictions therein contained, or of the rules prescribed pursuant to the laws regulating the issuance of passports * * * shall be fined not more than $2,000 or imprisoned not more than five years, or both."

18. *See, e. g.,* Hearing before the Subcommittee on Constitutional Rights of the Committee on the Judiciary, United States Senate, The Right to Travel, 85th Cong. 1st Sess., part 2 (1957) at 86–101. Law review writing on travel control is extensive, although primarily to the constitutional problems. *See, e. g.,* Ehrlich, Passports, 19 Stan.L.Rev. 129 (1966); Goodman, Passports in Perspective, 45 Texas L.Rev. 221 (1966); Pollitt & Raugh, Restrictions on the Right to Travel, 13 W.Res.L.Rev. 128 (1961); Velvel, Geographical Restrictions on Travel: The Real World and the First Amendment, 15 Kansas L.Rev. 35 (1966); Note, Constitutional Law: Resolving Conflict Between the Right to Travel and Implementation of Foreign Policy, 1966 Duke L.J. 233.

refused to enact legislation directed to precisely that end.[19] We see no basis for inferring that Congress, while unready to support the Secretary's area restrictions by adding the sanction of deprivation of personal liberty, has silently permitted the Secretary to impose administrative sanctions depriving a citizen of a part of his constitutional liberty (of travel to non-prohibited areas), a sanction often equal to and sometimes more stringent than criminal sanctions, without the protections inherent in the criminal process as a guarantee against executive excess.[20]

■ 6. To recapitulate, we think the Secretary may deny a passport, or revoke one already extant, when the sole travel that is intended by the citizen is to an area that the Secretary has declared restricted. But the soft support of silence from Congress does not permit an inference that it has authorized executive curtailment of the constitutionally protected "liberty" of travel to non-restricted areas to achieve the objective of restraining travel to restricted areas.

Guidance in ascertaining legislative intention as to the Secretary's power under the 1926 Act is furnished by reference to the historical distinction between control over passports and control over travel. Today, the "crucial function" of a passport is as an exit permit, lifting what is otherwise the bar of Section 215 of the Immigration and Nationality Act. But historically, as was stressed by the Court in *Laub*, the prime role of the passport—and a role over which the Secretary has undeniable authority—was to identify the bearer as a United States national entitled to "receive the protection and good offices of American diplomatic and consular officers abroad" and to officially request on the "part of the Government of the United States that the officials of foreign governments permit the bearer to travel or sojourn in their territories and in case of need to give him all lawful aid and protection." III G. Hackworth, Digest of International Law at 435 (1942).

■ In our view the Secretary's power includes but goes beyond a mere denial of diplomatic facilities to a citizen traveling in a restricted area. He has the authority under 18 U.S.C. § 1544 (1964) to determine how a passport may be "used." We think the Secretary may condition the issuance of a passport on the applicant's agreement to refrain from taking the passport into a restricted area, and, further, to lodge the passport in safe-keeping before such a trip is made. That a passport is an official document, issued under the Government's seal and embodying a formal Government request, makes acceptable considerable Governmental control over where and in what ways that document is used, provided that any such controls are generally applicable. A traveler's possession of an American passport, even in areas for which the passport is stamped "not valid," may well be deemed helpful both by the traveler and by the country involved, both as an official identification and as a lever in the event of some mishap during the journey.[21] The inability to take along a passport may inhibit some, although not the most determined, travelers to restricted areas. But we think that under *Zemel* this limited deterrence of travel, resulting from the Secretary's exercise of his power under the 1926 Passport Act, is not unconstitutional. See 381 U.S. at 13–15, 85 S.Ct. 1271. In short, we think the Secretary has authority to control the lawful travel of the passport, even though Congress has

19. *See, e. g.,* S. 4110, 85th Cong., 2d Sess. (1958), H.R. 14895, 89th Cong., 2d Sess. (1966).

20. See Chief Judge Bazelon's dissenting opinion in Briehl v. Dulles, 101 U.S.App. D.C. 239, 257, 248 F.2d 561, 579 (1957), the case in which the majority ruling was reversed *sub nom.* Kent v. Dulles, *supra.*

21. We note, for example, that both Lynd and Wittman took their United States passports with them. Although the North Vietnam visa was not stamped on the passport, it was brought out that Lynd displayed his passport to North Vietnamese officials (Hearing Tr. 70). Wittman refused to answer whether she had shown hers. (Hearing Tr. 45).

not given authority to control the travel of the person. This view is strengthened by the character of the passport, an official document that has consistently been regarded as the property of the Government.[22]

### III

The foregoing principles result in the following disposition of the particular cases before us:

#### A. *Wittman*

■ Appellant Wittman in effect declined to give any assurances as to her travel to designated areas "with or without using the passport." We do not think appellant has the right, which she asserted, to use a passport issued to her in violation of the conditions and restrictions which by law govern its use. We affirm the Secretary's revocation and withholding of a passport unless she agrees to refrain from the passport's use in (including transportation to) restricted areas.

#### B. *Lynd*

Unlike Miss Wittman, Professor Lynd gave all assurances requested of him with regard to the use of the passport. That does not establish his right to the injunctive relief requested. Although the cases arise in connection with the denial of a passport, the underlying right of the complainant with which this court is basically concerned is not the right to a passport as such. The right to a passport exists only in connection with intended travel. Passports are not issued merely because someone wants the document to frame on the wall. In his amended complaint, Lynd alleged as an irreparable injury his inability to travel to London to keep teaching commitments for the September, 1966 term. That particular journey is, of course, no longer an issue.

■ We think that reasonably concrete and specific travel outside the country must be in contemplation before a complainant can obtain injunctive re-

lief. There may be an inconvenience and irritation resulting from the temporary revocation of a passport during a period when the applicant has no desire to travel, but it is not an interest requiring injunctive relief either of a conventional or mandatory nature, directed to the Secretary, and the prayer for such relief may properly be tabled for want of equity.

We are aware that the Secretary routinely issues passports for millions of Americans whose travel plans are relatively indefinite. But they are not likely to travel into restricted areas. An applicant who will not give a commitment that would be given routinely by American tourists is not entitled to insist on the routine processing they receive. The Secretary may take measures reasonably suited to insure that such an applicant keeps his pledge not to use the passport in restricted areas, perhaps by requiring the applicant to leave the passport with a responsible depository, approved by the Secretary, in a country that has not been designated, before undertaking travel to designated countries. We therefore affirm the denial of an order intended to result in the issuance of a passport forthwith.

■■ Lynd also seeks a declaratory judgment "that the defendant's action in refusing passport facilities to permit the plaintiff to travel to all countries, except to [restricted countries] is contrary to law." Although his travel plans may not be sufficiently definite to require an equity court to interpose a mandatory injunction restoring his passport at this time, the dispute as to the Secretary's power is sufficiently "definite and concrete, not hypothetical or abstract" to bring it within the spirit of Aetna Life Ins. Co. of Hartford Conn. v. Haworth, 300 U.S. 227 at 242, 57 S.Ct. 461, at 464, 81 L.Ed. 617 (1937). A court may issue a declaration that the Secretary has erred as a matter of law in the reason assigned for denial of a passport without necessarily determining whether or

---

22. *See* III G. Hackworth, Digest of International Law 437–439 (1942), 22 C.F.R. § 51.9 (1967).

how a passport should be issued. Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320 (1939). Lynd's inability to make any definite specific plans until the underlying general controversy is resolved is, given his general intent to travel, basis for providing an appropriate general declaration. *Cf.* Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The cause is reversed and remanded with instructions to declare that the Secretary may not withhold Lynd's passport because of Lynd's failure to give assurance that he will refrain from travel to designated areas without a passport.

The judgment in 20790 is affirmed.

The judgment in 20448 is affirmed in part and reversed in part.