**UNITED STATES of America, Appellee,**

**v.**

**Leon WEISS et al., Defendants-Appellants.**

**Nos. 532–535, Dockets 73–1964 to 73–1967.**

United States Court of Appeals, Second Circuit.

Argued Nov. 21, 1973.

Decided Jan. 15, 1974.

---

———◆———

Howard A. Heffron, Washington, D. C. (Kostelanetz & Ritholz, New York City, Richard J. Medalie, Washington, D. C., of counsel), for defendants-appellants Leon Weiss and Ethel Weiss.

Richard J. Medalie, Washington, D. C. (Epstein, Friedman, Duncan & Medalie, Washington, D. C., of counsel), for defendants-appellants Melco International, Ltd. and Melco International, Inc.

Robert P. Walton, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., Kenneth R. Feinberg, John D. Gordan, III, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before LUMBARD, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

Following a nine-day trial before Judge MacMahon appellants Leon Weiss, Melco International, Inc. and its wholly-owned subsidiary, Melco International, Ltd. (sometimes collectively referred to as "Melco") were on May 30, 1973, convicted of (1) conspiracy to violate 18 U. S.C. § 1001 by causing false invoices and documents to be submitted to the Army and Air Force Exchange Service of the Department of Defense ("Exchange" herein) (Count 1), (2) causing invoices containing false statements to be submitted to an agency of the Exchange in violation of 18 U.S.C. §§ 1001 and 2 (Counts 2–17), and (3) mail fraud in furtherance of the scheme in violation of 18 U.S.C. § 1341 (renumbered Count 18). Appellants Weiss and his wife, Ethel Weiss, were also convicted of corruptly endeavoring to obstruct justice in violation of 18 U.S.C. § 1503 by failing to produce documents subpoenaed by the Grand Jury investigating the scheme (renumbered Count 19).

Upon this appeal all defendants contend that the trial judge denied them a fair trial. Mr. Weiss and the two corporate defendants argue that certain evidentiary rulings were erroneous and require a new trial. The Weisses further urge that Count 19 (alleging a violation of 18 U.S.C. § 1503) fails to state a crime. Mrs. Weiss adds the argument that she was improperly joined, and the corporate defendants assert that the district court's jurisdiction over them was not established. As to the last claim we remand the proceedings against the corporate defendants for a hearing to determine whether the court had jurisdiction over them. Finding no merit in the other contentions, we affirm.

The record, viewed in the light most favorable to the government, United States v. McCarthy, 473 F.2d 300, 302 (2d Cir. 1972), reveals a scheme engineered by Weiss to defraud the Exchange of thousands of dollars upon the termination of a concession agreement with the Vietnam Regional Exchange by inflating the actual costs incurred in

connection with performance of the contract, thus falsely increasing the amounts to which companies controlled by Weiss would be entitled by way of settlement. Beginning in 1966 Weiss was the President and controlling stockholder of defendant Melco International, Inc., a Liberian corporation which represented manufacturers in the sale of goods to Army and Air Force Post Exchanges ("PXs" herein) in the Far East. Weiss maintained his principal office in New York for the furnishing of supplies to PXs operated by the Exchange in various parts of the world.

In March 1967 Herbert J. McElroy, salesman for Melco International, Ltd., a wholly-owned Hong Kong subsidiary of Melco International, Inc., with Weiss' approval entered into a contract for the sale of Thai-manufactured goods to PXs in Vietnam. One month later, on April 18, 1967, the contract was terminated by the Exchange for reasons arising out of the adverse gold flow in the international balance of payments, which placed a strain upon the American dollar. Under the contract the termination entitled Melco to compensation for actual expenses and bona fide costs incurred in connection with its performance of the contract prior to its receipt of the termination letter.

Prior to the receipt of the notice of termination McElroy had on behalf of Melco obtained the agreement of three Thai suppliers (Longsan Limited, Thai Lapidary, and Thai Celanese) to furnish one month's supply of goods at a cost of approximately $43,000. At the same time, in order to gain a secret mark-up for Melco, McElroy had, with Weiss' approval, arranged with two of the Thai suppliers (Longsan and Thai Lapidary) that they would prepare double sets of invoices covering approximately $40,000 of the goods, one set showing the actual wholesale price to Melco and the other a higher wholesale price (increased by 10% on goods to be furnished by one supplier and 25% on goods from the other) for submission to the Exchange. Under this arrangement the two Thai

suppliers, who were themselves realizing their profit on the lower invoiced price, would collect and "kick back" to Melco the difference between the two invoiced prices. In this way Melco would realize not only a mark-up amounting to the difference between the wholesale and retail prices disclosed to the Exchange but the secret "kick back" as well.

After receiving the notice of termination McElroy, again with Weiss' approval, secured the agreement of the Thai suppliers to a plan whereby they would cooperate with Melco in enabling it falsely to represent to the Exchange that it, prior to the termination of the Exchange contract, had made irrevocable commitments to them to buy approximately $300,000 worth of Thai goods instead of the actual commitments of approximately $43,000. Accordingly a settlement proposal based on the false $300,000 commitment was submitted in June 1967 by Melco to the Exchange with Weiss' approval, supported by back-dated letters from the two collaborating Thai suppliers, falsified invoices, and fraudulent affidavits signed by McElroy.

Upon McElroy's being transferred by Weiss to Germany, John Moore, a Melco representative in Hong Kong, was assigned to conclude the settlement negotiations after being fully briefed by Weiss regarding the fraud and the hidden markup to be realized by Melco. Rather than risk delaying receipt of the kick back from the two suppliers until after they had received the inflated prices from the Exchange, Weiss arranged through a Swiss bank to pay each supplier the agreed-upon lower secret price (10% lower than the price on each invoice bearing the Exchange stamp in the case of Longsan and 25% lower in the case of Thai Lapidary) upon proof that the goods had been shipped to the Exchange at the inflated price. He then received from the suppliers releases falsely acknowledging that they had received the inflated amounts in payment when in fact they had been paid the lower true amounts.

Melco was thus in a position directly to collect the inflated sums from the Exchange. As a result it realized approximately $42,000 to which it would not have been entitled if the truth had been revealed to the Exchange.

Mrs. Weiss became involved in the scheme after the Grand Jury began an investigation into Weiss' activities and a subpoena was on March 5, 1971, served on Weiss for production of invoices and records relating to the settlement of the Vietnam PX contract. Thereupon Mrs. Weiss, after discussing the matter with her husband, made a secret trip from New York to Hong Kong where, aided by Leland Gage, Moore's successor at Melco's office there, she obtained the incriminating invoices showing the actual prices paid by Melco to the Thai suppliers. These documents were taken by her to Switzerland and, except for one such invoice from Thai Lapidary apparently furnished to the Grand Jury by mistake, were never turned over to the Grand Jury. Shortly thereafter Weiss denied to the district court having made any effort to obtain the documents from Hong Kong.

*The Exclusion of Evidence Tending to Show that Melco May Not Have Realized an Overall "Profit"*

■ In support of its settlement of the terminated contract with the Vietnam PX Melco submitted to the Exchange not only the false invoices from the two Thai suppliers but also evidence of other costs incurred, including outlays for supplies, travel expenses, equipment, office rental, automobile purchases and rentals, advertising, and the like. None of these latter charges were alleged by the government to have been falsified or inflated. Nor were they the subject of any charges in the indictment. Nevertheless Weiss and the corporate defendants sought to introduce proof at trial that it had understated these merchandising expenses and that Melco's total costs and expenses in connection with the contract exceeded its total proceeds received from the Ex-

change under the termination agreement, leaving it no profit.

Weiss argues that the trial court's exclusion of the foregoing evidence of merchandising expenses was error, in view of the prosecutor's repeated statements to the jury that the defendants had realized a "secret profit" from the alleged fraud. We disagree. The argument distorts the charge against the defendants and the meaning of the word "profit" as used in context by the government. The indictment alleged, and the evidence established, that by use of false invoices and other fraudulent representations Weiss and Melco knowingly induced the Exchange to buy a greater quantity of Thai merchandise than it was actually obligated to purchase and to pay higher prices for the goods than those which it would have been required to pay if the truth had been revealed. The "secret profit" referred to by the prosecutor clearly referred to the fraudulent markup or difference between the actual and falsely inflated prices for the goods, including the prices for merchandise which Melco falsely represented itself as being committed to buy when it was not.

Whether or not Melco realized an *overall* profit or loss on its settlement of the entire contract was irrelevant. The proof established that if it had disclosed the facts with respect to its actual commitment and purchase prices it would not have succeeded in inducing the Exchange to obligate itself to pay for the larger amount of the merchandise claimed or the higher prices charged for that merchandise.

United States v. Wertheimer, 434 F.2d 1004 (2d Cir. 1970), relied on so heavily by Weiss and the corporate defendants, is distinguishable from the present case, we think, since it involved much more than a possible loose but entirely reasonable use of terms by the government. In that case the defendant was charged with falsely certifying that he had shipped merchandise to an agency of the United States government when in fact it had not been shipped at the time of

the certification. Eventually, as the government knew, the merchandise was shipped and delivered to it. Nevertheless at trial the government prosecutor flatly stated to the jury that the shipments, for which the government had paid $25,000, "were not made," thus seriously prejudicing the defendant by deliberately misrepresenting objective facts not material to the charge and giving the jury the impression that the government had been cheated out of $25,000. Here, on the other hand, the government prosecutor merely used the words "profit" and "markup" interchangeably in referring to the defendants' conduct in secretly adding 10 to 25% onto the cost of goods sold by them to the government, with the result that the government paid higher prices than it otherwise would have paid. Under the circumstances there was little danger that the jury would interpret the prosecutor's occasional use of the word "profit" instead of "markup" as any assertion at all concerning the immaterial issue of *overall* profit. We cannot, therefore, ascribe to these references prejudice such as existed in *Wertheimer*.

### The Exclusion of Leon Weiss' Passports

█ In an effort to prove that he was not in Bangkok at the time of certain conspiratorial meetings with McElroy, Weiss, without any testimonial foundation, offered two United States passports which had purportedly been issued to him and bore no stamps or entries indicating that he was in Thailand during the relevant period. The trial court excluded the passports on the ground that they had not been authenticated properly.

Weiss contends that the passports should have been admitted without testimonial authentication as "official records" pursuant to Rule 27, F.R.Cr.P., which permits proof of an official record in the same manner as in civil actions, and Rule 44(a), F.R.Civ.P.[1] Weiss first argues that a passport is an "official record," as that term is used in Rule 44(a), because it is issued by the Secretary of State for use as an authentic travel document attesting to the identity and nationality of the bearer, 8 U.S.C. § 1101(a)(30), 22 C.F.R. § 51.-1(e) (1973 ed.), see United States v. Laub, 385 U.S. 475, 481, 87 S.Ct. 574, 17 L.Ed.2d 526 (1967), it bears the seal of the Department of State, it remains the property of the United States, it is returnable on demand, 22 C.F.R. § 51.9 (1973 ed.), and it may be altered or stamped only by authorized domestic or foreign officials. Undoubtedly a passport may properly be described as an "official" document in the sense that it is issued by the government and represents a request by the government to give safe passage to the bearer. See Lynd v. Rusk, 128 U.S.App.D.C. 399, 389 F.2d 940, 947 (1967). However, a passport, being in the custody of the citizen to whom it is issued, does not satisfy the further requirements of Rule 44(a) that the document be "kept' within the United States" and be in the "custody" of an officer of the government.

█ In the alternative Weiss argues that even though a passport may not itself qualify as an "official record" it does qualify as an "official publication thereof," which satisfies the requirements of Rule 44(a) for authentication since it bears the seal and stamp of the

---

1. "(1) *Domestic.* An official record kept within the United States, or any state, district, commonwealth, territory, or insular possession thereof, or within the Panama Canal Zone, the Trust Territory of the Pacific Islands, or the Ryukyu Islands, or an entry therein, when admissible for any purpose, may be evidenced by an official publication thereof or by a copy attested by the officer having the legal custody of the record, or by his deputy, and accompanied by a certificate that such officer has the custody. The certificate may be made by a judge of a court of record of the district or political subdivision in which the record is kept, authenticated by the seal of the court, or may be made by any public officer having a seal of office and having official duties in the district or political subdivision in which the record is kept, authenticated by the seal of his office."

Department of State attesting to certain facts concerning the holder which are a matter of official record with the government, i. e., his birth, citizenship, address, etc. Our attention is drawn to authority indicating that a district court should be permitted in its discretion, absent a claim that a passport is counterfeit or spurious, to admit it into evidence where it would be probative of an issue in dispute, such as the holder's citizenship, without the necessity of requiring a party to subpoena government officials to testify to the obvious. See Pereira v. Murff, 169 F.Supp. 81, 84 (S. D.N.Y.1958).

█ Here, however, we need not face that issue because the Weiss passports were not offered simply to prove matters of record in the Department of State but would be competent only upon introduction of proof by authorities of Thailand that if Weiss had entered or left that country during the relevant period entries would surely have been placed upon the passports. Absent such proof the exclusion of the passports as not competent was not clearly erroneous. Furthermore, even if such evidence had been introduced, it would at best have cast doubt on McElroy's testimony that he had met Weiss in Bangkok in May or June 1967. McElroy, however, testified that he could not be certain of the time, which he described as "approximate." Thus, even assuming *arguendo* that the exclusion of the evidence was error, it was harmless.

### The Sufficiency of Count 19

█ Count 19 (renumbered as such after former Counts 18–22 were dismissed) charged, essentially in the language of 18 U.S.C. § 1503, that the Weisses corruptly endeavored to obstruct justice by failing to produce documents which Weiss was commanded to produce by the subpoena issued by the Grand Jury investigating the alleged fraudulent scheme. The trial court, recognizing that the term "corruptly" as used in the statute requires proof of more than mere failure to produce the documents,

instructed the jury that in order to find the Weisses guilty it must find some affirmative conduct on their part, such as destruction, concealment or removal of the documents. The jury had before it sufficient evidence to enable it so to find.

█ The Weisses, however, argue that the indictment was insufficient on its face for failure to allege, more specifically than failure to produce documents, the conduct by which they corruptly endeavored to obstruct justice. We disagree. Such details need not be alleged as long as the indictment furnishes sufficient information as to the time, place and essential elements of the crime to enable the defendants to prepare for trial and avoid a claim of double jeopardy. United States v. Salazar, 485 F.2d 1272, 1277 (2nd Cir. 1973). The present indictment satisfied these requirements. The defendants at no time argued that they were unprepared to meet the government's proof. Although they sought particulars, including a list of the documents not produced, the Weisses made no demand for further details as to the conduct constituting the alleged "corrupt" endeavor to obstruct the investigation. Nor did they seek a continuance when the government, within a day after the Weisses first moved to dismiss Count 19, outlined its proof as to that count. In short, they were sufficiently apprised of the charge to enable them to prepare and defend with respect to it.

### The joinder of Mrs. Weiss

█ Mrs. Weiss, who is named as a defendant in Count 19 (charging obstruction of justice) only, argues that she was improperly joined with the other defendants in violation of Rule 8(b), F.R.Cr.P., and that it was error not to have granted her motion for a severance and separate trial of the offense charged against her. Rule 8(b) provides:

"(b) *Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated

in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

The key question is whether Mrs. Weiss participated in the "same series of acts or transactions constituting an offense or offenses." She contends that since she did not play any part at all in the underlying scheme to defraud, which formed the basis of the first 18 counts against the other defendants, and since the conduct upon which the obstruction of justice charge against her did not take place until two years after the completion of that scheme, she cannot be said to have participated in the same series of acts or transactions constituting an offense or offenses. See United States v. Granello, 365 F.2d 990, 993–994 (2d Cir. 1966), cert. denied, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967); United States v. Leach, 429 F. 2d 956, 960 (8th Cir. 1970), cert. denied, 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 151 (1971). The government, on the other hand, argues that since the purpose of the alleged obstruction of justice was to prevent it from adducing proof of the underlying scheme the situation is analogous to cases holding that charges of attempted concealment or cover-up of a crime are sufficiently connected with the crime itself to permit joinder. See United States v. Carson, 464 F.2d 424, 436 (2d Cir.), cert. denied, 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972); United States v. Sweig, 441 F.2d 114, 118–119 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L. Ed.2d 711 (1971).

While joinder of two or more offenses against the same defendant have been permitted pursuant to Rule 8(a) in the decisions cited by the government, this hardly supports joinder of different defendants upon separate charges under Rule 8(b), which is more restrictive. See United States v. Granello, supra, 365 F.2d at pp. 993–994. However, we need not decide this difficult question in the present case since, even assuming Mrs. Weiss was improperly joined, she has failed to show any prejudice to herself as a result of the joinder. If Count 19 had been tried separately, the government would have been allowed to introduce most if not all of the proof of the underlying fraudulent scheme in order to establish her motive, as Weiss' wife, to play a major part in obstructing the government's investigation into that scheme by removing material proof of her husband's participation in it. See United States v. Granello, supra, 365 F. 2d at p. 995; United States v. Roselli, 432 F.2d 879, 901 (9th Cir. 1970). Lastly Mrs. Weiss was further protected against "spillover" prejudice by the court's instructions to the jury, repeated on four occasions, that it must consider each charge against each defendant separately on the basis solely of the evidence introduced with respect to the defendant on that count. That the jury followed this instruction is evidenced by its specific request for a rereading of the court's charge relating to Mrs. Weiss.

*The Conduct of the Trial*

All defendants contend that they were denied a fair trial because of prejudicial conduct, rulings and statements on the part of the trial judge during the nine-day trial. See, e. g., United States v. Nazzaro, 472 F.2d 302 (2d Cir. 1973); United States v. Dellinger, 472 F.2d 340, 385–391 (7th Cir. 1972), cert. denied, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). Specifically they point to the judge's threats to hold counsel in contempt, his order (later vacated) holding one defense attorney in contempt, his rebukes of defense counsel and deprecatory remarks regarding their conduct of the defense, his interference with the examination of witnesses and his disparaging comments regarding the defense. A rather impressive array of rebukes, threats and harsh statements by the trial judge, taken out of context, are quoted in appellants' briefs as dem-

onstrating that the judge displayed to the jury such favoritism toward the government, such bias against the defendants, and such hostility toward their counsel, that they were precluded from obtaining the impartial consideration of the evidence by the jury to which they were entitled.

As we have recently observed in United States v. Nazzaro, 472 F.2d 302 (2d Cir. 1973), the task upon appellate review of determining whether a judge's conduct has "improperly . . . shifted the balance against a defendant" is a difficult one, especially since the printed record cannot convey the atmosphere, the tones of voice of judge, counsel and parties, and their facial expressions.[2] See United States v. Boatner, 478 F.2d 737 (2d Cir. 1973). However, we are relegated to doing the best we can with the aid of the trial transcript, bearing in mind the substance or triviality of the various matters claimed to have been the subject of prejudicial conduct or remarks on the judge's part. Experience teaches that quotations lifted out of the transcript can often be unintentionally misleading, since they usually fail to give a true or complete picture of the framework for and background of the allegedly prejudicial comments. Counsel, being advocates, also tend to attach excessive significance to some remarks and to overlook counterbalancing portions of the record. For these reasons it is essential, at least where appellants' brief (as here) raises a substantial issue as to the trial judge's fairness in conducting the trial, to make a "close scrutiny of each tile in the mosaic." United States v. Nazzaro, supra, 472 F. 2d at p. 304, which means reading the entire trial transcript, in this case 1,280 pages. This we have done.

Many of the trial judge's comments, characterizations, and castigations of counsel would have been better left unexpressed, since they not only failed to serve any useful purpose but raised serious doubts as to the court's impartiality and judicial detachment. However, our detailed review of the record satisfies us that appellants' contentions, except for one asserted on behalf of the corporate defendants (discussed below), are grossly exaggerated. The excerpts quoted seriatim in appellants' briefs, while indicating a possible attitude of partisanship, are not truly representative of the judge's trial conduct and hence convey a distorted impression of the trial. The overwhelming bulk of the trial transcript reveals normal temperate conduct on the part of counsel and judge, with the latter limiting himself to categorical rulings on counsel's objections. As for the balance, many of the court's unfortunate comments quoted by appellants occurred outside of the jury's presence and hence could not have influenced the jury. Others were clearly provoked by defense counsel's unnecessary comments or statements in connection with their voicing of objections or by their pressing objections or arguments that were frivolous, repetitious, or in disregard of the court's earlier rulings. When defense counsel repeatedly and persistently attempts to introduce irrelevant evidence (e. g., in this case proof of merchandise expenses designed to show that no *overall* profit was realized) he must expect that once the trial judge has made his basic ruling successive objections by the government will undoubtedly be sustained. Nor is it surprising that such wasteful tactics will lead a trial judge, during the heat of a nine-day trial, sometimes to become impatient. Judges, while expected to possess more than the average amount of self-restraint, are still only human. They do not possess limitless ability, once passion is aroused, to resist provocation.

Whatever display of impatience or irritation was exhibited by the trial judge toward defense counsel, the record fur-

**2.** For instance we have no way, absent video-tape and sound recording, of appraising appellants' statement that "no trial day was completely free from shouting or near-shouting by the court."

ther reveals that, while the judge from time to time took defense counsel to task, he did not hesitate likewise to express disapproval of some of the prosecutor's tactics and to sustain numerous defense objections. On the whole, therefore, the trial judge, while openly displaying displeasure on some occasions, was relatively evenhanded. We cannot conclude from our thorough examination of the transcript that he displayed partisanship amounting to prejudicial error, or that his heated outbursts were "pervasive," see Offutt v. United States, 348 U.S. 11, 17, 75 S.Ct. 11, 99 L.Ed. 11 (1954). In the few instances where he questioned witnesses his queries appear to have been for the purpose of clarifying the record and not "designed to inject doubt or uncertainty as to the credibility of witnesses," see United States v. Nazzaro, *supra.* As we have often reminded parties "[a] defendant is entitled to a fair trial but not a perfect one." Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953). While many of the judge's comments were improper, they did not singly or cumulatively approach the level of such harshness or contempt for the defense as to amount to denial of a fair trial. See United States v. Dellinger, *supra.*

■ The trial court's treatment of counsel for the corporate defendants, on the other hand, stands on a different footing. Approximately one month prior to trial Judge MacMahon assigned William S. Hack, who had acted as attorney for the corporate defendants in certain matters, to defend them in this criminal case. Thereupon Mr. Hack wrote a letter to the court declining the appointment on the ground that he lacked trial competence. He had never participated in a criminal trial in his life; in fact his only participation in any jury trial had been his representation, some 15 years earlier, of a low-income tenant in a dispute with his landlord. Notwithstanding Hack's lack of qualifications to represent the corporate defendants at trial the judge, refusing to listen to or to accept Hack's protestations of incompetency, ordered him to represent them at trial, threatening in an open courtroom clash before trial to hold Hack in contempt and to report him to the Association of the Bar if he did not do so. Hack finally acceded after the judge at first refused to permit him to retain an experienced criminal trial lawyer to advise and assist him but later allowed the attorney to sit with him during the trial.

The conduct of the trial judge, including his excoriation of Hack, displays of temper and threats of contempt, was wholly unjustified. Admission to the district court bar of a lawyer who has never before tried a criminal case does not *ipso facto* qualify him to act as defense counsel in a complicated conspiracy trial. The proper procedure, if the corporate defendants persisted in refusing to appear by retained counsel, was to appoint a lawyer qualified to serve. Indeed, appointment of the attorney whom Hack sought to retain as his adviser would have been preferable to the course taken by the court.

Despite the impropriety in forcing Hack to serve against his will the corporate defendants did not suffer prejudice requiring a new trial of the charges against them. Although they might have chosen to defend on the theory that Weiss, McElroy and Moore had acted *ultra vires* or beyond their authority in representing the corporations which were the subject of the indictment, such a frivolous defense would have been doomed to inevitable failure, in view of Weiss' position as controlling stockholder, president and managing agent of Melco, and the overwhelming proof of his authority and that of McElroy and Moore. In all other respects the interests of the corporations were identical with those of Weiss, who was competently and vigorously defended by able trial counsel. Any and all steps that would have been taken on their behalf by their own counsel were taken by Weiss' attorney with the same force and effect. Furthermore, Mr. Hack, while

lacking any criminal trial experience and remaining mute through most of the trial, did voice essential motions on behalf of the clients to whom he was placed in bondage by the court. He briefly summed up to the jury and acted with the advice of an attorney experienced in criminal defense practice. Under the circumstances, particularly the fact that the corporate defendants gained the full benefit of Weiss' defense, we cannot say that they were denied a fair trial.

*The Court's Jurisdiction Over the Corporate Defendants*

 The district court's jurisdiction over the corporate defendants was predicated on the appearance as a defendant of Leon Weiss, their principal officer and controlling stockholder, and the government's mailing of copies of the summons to each corporation at various addresses, including those overseas and its last known address in New York City, and to the New York Department of State in Albany. However, in response to a pretrial motion by the government to ascertain whether Weiss was a managing agent for the corporations and for appointment of counsel to represent them, Weiss' counsel claimed that he was not their agent, and that they were not doing business in New York which would subject them to the court's jurisdiction. The court, refusing a hearing requested by the government and Weiss' counsel, found that the corporate defendants were within its jurisdiction and that Weiss was their managing agent.

Upon the record we cannot conclude that the corporations were subject to the court's jurisdiction at the time of filing of the indictment (i. e., February 1973), which is the operative time for jurisdictional purposes, whatever may have been their activities in New York during prior years. The burden was upon the government to establish current jurisdictional facts. If, as was contended by Weiss' counsel, the corporations had long since left the jurisdiction, service of process on their former man-aging agent or upon the Secretary of State would be unavailing to confer jurisdiction upon the court.

For these reasons the case against the corporate defendants must be remanded to the district court with directions to hold a hearing for the purpose of determining whether they were present within the jurisdiction at the time of indictment and whether Weiss continued to be their managing agent at that time.

We have considered the other arguments advanced by appellants and find them to be without merit.

The convictions of Mr. and Mrs. Weiss are affirmed. The judgment against the corporate defendants is remanded for further proceedings consistent with this opinion.