**UNITED STATES of America**

v.

**BEATY, William Edwin, Appellant
in 83–5021**

**and**

**UNITED STATES of America**

v.

**John BALLOUZ, Appellant in 83–5045.**

**Nos. 83–5021, 83–5045.**

United States Court of Appeals,
Third Circuit.

Argued Sept. 12, 1983.

Decided on Dec. 12, 1983.

Dominic F. Amorosa (argued), South Orange, N.J., for appellant, Beaty.

David A. DePetris (argued), New York City; Genay Ann Leitman, New York City, for appellant, Ballouz.

Robert Fettweis, Asst. U.S. Atty. (argued), W. Hunt Dumont, U.S. Atty., Samuel Rosenthal, Chief, Appeals Div., Edna F. Ball, Asst. U.S. Attys., Newark, N.J., for appellee.

Before ADAMS, HUNTER, and GARTH, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

Defendants John Ballouz and William Beaty appeal from their convictions on a number of drug-related offenses.[1] The

---

1. A grand jury returned a seven-count indictment against Beaty, Ballouz, and three co-conspirators. Count 1 charged conspiracy to import 36,000 pounds of hashish, in violation of 21 U.S.C. § 963 (1976). Count 2 charged conspiracy to possess such hashish with intent to distribute, in violation of 21 U.S.C. § 846 (1976). Counts 3 and 5 charged use of the telephone to facilitate possession with intent to distribute, in violation of 21 U.S.C. § 843(b) (1976) and 18 U.S.C. § 2 (1976). Count 4 charged possession on the high seas with intent to distribute such hashish, in violation of 21 U.S.C. § 955a(a) (Supp. V 1981) and 18 U.S.C. § 2 (1976). Counts 6 and 7 charged attempt on the high seas to possess hashish with intent to distribute, in violation of 21 U.S.C. § 963 (1976) and 18 U.S.C. § 2 (1976). On December

principal question presented in both cases is whether the trial judge, by his conduct, deprived the defendants of a fair trial. Both defendants also claim to have been prejudiced by prosecutorial misconduct.[2] After carefully reviewing the trial transcript, we conclude that the judge's conduct with regard to defendant Beaty, while sometimes unfortunate, did not rise to the level of prejudicial error. With respect to defendant Ballouz, however, we conclude that the trial judge's conduct was prejudicial. We will therefore reverse Ballouz's conviction and remand his case for a new trial. We have also considered the allegations of prosecutorial misconduct with respect to defendant Beaty, but are not persuaded that any errors in the prosecutor's conduct were prejudicial. Because we do not believe that any of the errors in Beaty's trial, considered individually or cumulatively, prejudiced him, we will affirm defendant Beaty's conviction.

## I. FACTS

A brief recital of the evidence adduced at trial is helpful in considering defendants' claims. According to the Government, William Beaty asked a longtime friend, John Clark, if he would be interested in helping Beaty smuggle hashish into the United States. Clark was interested. Beaty explained that he needed a boat and a crew to ferry the hashish from the "mother ship" to shore. Clark arranged for Beaty to meet Robert Soleau, a commercial fisherman. Soleau agreed to provide the *Falcon* to carry the hashish, and a "safe boat," the *Tanqueray,* to carry people to count the bales of hashish and then return those people to shore separately from the drugs.

The operation was carried out on the night of October 9, 1981. Government witnesses testified that Ballouz was on the *Falcon* and Beaty was on the *Tanqueray.* Due to a combination of factors, the opera-

tion was unsuccessful. The weather was bad, the sea was rough, and the *Falcon* was overloaded. Eventually, after its crew was transferred to the *Tanqueray,* the *Falcon* sank. Government witnesses testified that Beaty was subsequently involved in two unsuccessful attempts to salvage the lost hashish.

Defendant Beaty presented no evidence. Defendant Ballouz presented an alibi defense. He testified that he lived in California, but had come to New Jersey the week of October 9th to surprise his parents for his birthday. He discovered only after his arrival that they had gone to California to surprise him. He testified that he could not have been on the *Falcon* because he spent the evening of October 9th having dinner with Mrs. Axelson, an old friend. He presented Mrs. Axelson, his father and brother, and Mr. Rumolo, an old friend, as witnesses.

## II. THE TRIAL JUDGE'S CONDUCT: DEFENDANT BEATY

Beaty claims that the judge "chilled" his counsel, thereby denying Beaty effective assistance of counsel, by showing "favoritism" to the Government while constantly criticizing Beaty's counsel. He also claims that the judge's "favoritism" communicated the judge's belief in Beaty's guilt to the jury, thereby prejudicing Beaty and depriving him of a fair trial.

 The law governing judicial participation in trials, while easy to state, is difficult to apply. On the one hand, it is clear that "[i]n a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial...." *Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 698, 77 L.Ed. 1321 (1933). Indeed, this court has emphasized that:

> Fifth and Sixth Amendment rights were violated because the public defender who represented him at his bail hearing was also representing a co-conspirator who had plea-bargained with the government. We have considered each of these claims and find them to be wholly without merit.

1, 1982, the jury returned a verdict of guilty on all counts as to both defendants.

2. Defendant Beaty also claims that his sentence on Count 2 of the indictment violated the statutory maximum, that the judge erroneously charged the jury on this count, and that his

We have long abandoned the adversary system of litigation which regards opposing lawyers as players and the judge as a mere umpire whose only duty is to determine whether infractions of the rules of the game have been committed. A trial is not a contest but a search for the truth so that justice may properly be administered. For the purpose of eliciting the germane facts, a judge may on his own initiative and within his sound discretion interrogate witnesses.

*Riley v. Goodman,* 315 F.2d 232, 234 (3d Cir.1963) (citations omitted). On the other hand, a judge must not "abandon his proper role and assume that of an advocate...." *United States v. Green,* 544 F.2d 138, 147 (3d Cir.1976), *cert. denied,* 430 U.S. 910, 97 S.Ct. 1185, 51 L.Ed.2d 588 (1977). We have cautioned that "[t]he judge's participation must never reach the point where 'it appears clear to the jury that the court believes the accused is guilty.'" *United States v. Nobel,* 696 F.2d 231, 237 (3d Cir. 1982) (quoting *United States v. Robinson,* 635 F.2d 981, 984 (2d Cir.1980), *cert. denied,* 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981)).

■ Unfortunately, "the manner in which interrogation should be conducted and the proper extent of its exercise are not susceptible of formulation in a rule." *United States v. Green,* 544 F.2d at 147 (citations omitted). The task of an appellate court asked to review a trial judge's conduct is therefore a difficult one. We approach this case cautiously, aware that "no absolute, rigid rule exists. Each case must be viewed in its own setting. The pattern of due process is picked out of the facts and circumstances of each case." *Riley v. Goodman,* 315 F.2d at 234 (citations omitted).

■ The judge's conduct of this trial undeniably left much to be desired. Whether or not his conduct was ideal, however, is not the issue before us. We must determine whether his conduct was so prejudicial as to deprive defendant Beaty of a fair, as opposed to a perfect, trial. *See United States v. Parodi,* 703 F.2d 768, 776 (4th Cir.1983); *United States v. Robinson,* 635 F.2d at 984. A careful and detailed review of this trial record of more than 1600 pages satisfies us that, while the decision is not an easy one, Beaty has not made a sufficient showing of prejudice to require a new trial.

Initially, we note that the court's rebukes of Beaty's counsel, serious as some of them were,[3] occupy but a small portion of the extensive trial court record. Furthermore, the bulk of these rebukes occurred out of the presence of the jury. The record also reveals that these reprimands were far from unprovoked. Beaty's lawyer apparently believed that he should be allowed to elicit otherwise inadmissible hearsay on the grounds of relevance. He also believed that he could ask questions tending to impugn the veracity of the prosecution's witnesses without any good faith basis. The trial judge, quite correctly, flatly disagreed. The record reveals a judge who was increasingly frustrated by counsel's repeated attempts to do that which he had properly been forbidden to do.

■ When considered in this context, the only really serious altercation between the judge and Beaty's counsel is less troubling. The judge essentially cross-examined Beaty's counsel in the jury's presence concerning counsel's basis for a question that intimated that a prosecution witness was lying. We cannot condone the judge's conduct or say that the ensuing colloquy would not better have been conducted outside the

---

**3.** For example, when Beaty's counsel, during cross-examination of a government witness, sought to question the witness as to whether he had lied under oath in an earlier, unrelated bankruptcy proceeding, the district court judge, after ruling that the question was improper, continued by asking Beaty's counsel: "Do you know he [the prosecutor] can put you on the stand and ask you the basis for the question?" Beaty's counsel charged that this suggestion by the court intimidated and chilled him. While we do not quarrel with the court's substantive ruling in the context in which it appears, we question the need for the district court judge to threaten defense counsel with taking the stand and responding to questioning by the prosecutor. Nor was this the only occasion on which the district court expressed itself in this same fashion.

jury's presence. But "misconduct by defense counsel may properly be taken into account by us in determining whether a defendant was prejudiced by the judge's response." *United States v. Robinson*, 635 F.2d at 985 (citations omitted). In *United States v. Weiss*, 491 F.2d 460, 468 (2d Cir. 1974), *cert. denied*, 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974), the Second Circuit recognized that, "Judges, while expected to possess more than the average amount of self-restraint, are still only human. They do not possess limitless ability, once passion is aroused, to resist provocation." We likewise reject any suggestion that defense counsel may inject reversible error into a trial by baiting the trial judge.

In considering Beaty's claim we also consider whether the judge exhibited partisanship by favoring Government trial counsel or holding them to lesser standards than those applied to counsel for the defendant. *See United States v. Robinson*, 635 F.2d at 985. He did not. The judge appeared to resolve all doubts concerning the admissibility of evidence in favor of the defense and repeatedly sustained defense objections to the prosecutor's questions. On occasion, he expressed disapproval of the prosecutor's conduct and, in general, he expected her to conform to a very high standard. Although we do not approve of the judge's rebukes of counsel, his relatively even-handed treatment of Government and defense counsel persuades us that his admonitions of Beaty's counsel did not convey a belief in Beaty's guilt to the jury.

Furthermore, we are persuaded that Beaty was not denied effective assistance of counsel because Beaty's counsel never acted as though he felt chilled. He zealously represented Beaty throughout. He extensively and vigorously cross-examined each prosecution witness. He pursued every possible avenue in testing their credibility and recollections. He frequently objected during the prosecutor's examinations. In sum, the record reveals no evidence that Beaty's counsel was chilled.

■ Beaty also claims that the judge frequently "rehabilitated" prosecution witnesses, and in so doing, conveyed to the jury his belief that they were credible. The questions complained of were designed to clarify testimony and pertained to no ultimate issue of fact for the jury. As such, they were proper unless they conveyed to the jury the judge's belief on the proper outcome of the trial. *Riley v. Goodman*, 315 F.2d at 235. Only one instance of questioning presents a sufficiently serious possibility of prejudice to merit further discussion. Defense counsel extensively elicited during cross-examination that Robert Soleau had previously lied under oath. At certain points in this lengthy cross-examination, Soleau's testimony became confused. The judge interrupted cross-examination to ask such questions as: "Did you tell any other lies to the Grand Jury other than trying to protect the names of the two men that you just gave?"; and "Did you at any time tell any lies to the authorities and falsely accuse anybody?" Given the extreme sensitivity of these questions, it might have been better for the judge to refrain altogether from asking them. Certainly he should have waited until after the prosecutor had had an opportunity on redirect examination to clear up any confusion. It may well have been error for the judge to interrupt cross-examination in this fashion. If it was, however, we do not believe that it rose to the level of prejudicial error.

We are unpersuaded that these questions implied to the jury that the judge believed Soleau. *See United States v. Parodi*, 703 F.2d at 776; *United States v. Robinson*, 635 F.2d at 986. Considered in isolation, they are nevertheless troublesome because a jury might think that a witness would be more likely to tell the truth to the judge than to counsel. The record reveals, however, that Beaty's counsel skillfully disproved any such inference. After Soleau told the judge that he had not lied other than to protect the names of "two men," Beaty's counsel impeached the witness by pointing out that he had actually lied to protect the names of three men. Thus neutralized, we do not believe that these questions prejudiced Beaty.

The sheer length of this two week trial makes us cautious about investing any but

the most inflammatory isolated statements with critical importance. We do not believe that a few summary questions or intemperate remarks assumed the same importance in the jury's mind as they naturally have in counsel's while preparing this appeal. *See United States v. Weiss,* 491 F.2d at 468. Although we acknowledge that this question is an uncomfortably close one, when the length of the trial and the overwhelming evidence of Beaty's guilt[4] are considered, we are convinced that Beaty was not prejudiced by the judge's conduct.

### III. THE TRIAL JUDGE'S CONDUCT: DEFENDANT BALLOUZ

We cannot reach the same conclusion with respect to defendant Ballouz. The judge's conduct, always troublesome, became clearly prejudicial when he lengthily questioned three of Ballouz's four witnesses in a manner which Ballouz fairly labels as "cross-examination."[5] The court's vigorous participation in examining the defendant's witnesses, especially when contrasted with the complete freedom from hostile interruption of the prosecution's witnesses, must certainly have conveyed the judge's skepticism about Ballouz's alibi to the jury. *See United States v. Nazzaro,* 472 F.2d 302, 310 (2d Cir.1973). "'A trial judge's isolated questioning to clarify ambiguities is one thing; however, a trial judge cannot assume the mantle of an advocate and take over the cross-examination for the government to merely emphasize the government's proof or question the credibility of the defendant and his witnesses.'" *United States v. Singer,* 710 F.2d 431, 436–37 (8th Cir.1983) (in banc) (quoting *United States v. Bland,* 697 F.2d 262, 265–66 (8th Cir.1983) (footnotes and citations omitted)).

We are particularly disturbed by the court's examination of Mrs. Axelson, the witness who testified that Ballouz spent the evening of October 9th with her. This exchange is reprinted in full in the Appendix to this opinion. Mrs. Axelson was the only witness (other than the defendant) whose testimony could not have been harmonized with the prosecution's version of the truth. She was therefore a "key" witness, and the jury's verdict ultimately rested on the jurors' evaluation of her credibility.[6] We have long held that a judge must be extremely careful, especially when dealing with a key witness, to "minimize its own questioning ... to the end that any such judicial departure from the normal course of trial be merely helpful in clarifying the testimony rather than prejudicial in tending to impose upon the jury what the judge seems to think about the evidence." *Groce v. Seder,* 267 F.2d 352, 355 (3d Cir.1959). In this instance, the judge's questions cannot possibly be construed as "clarifying." They were completely unrelated to the offenses with which Ballouz was charged, the alibi which Ballouz offered, and the substance of Mrs. Axelson's testimony. Rather the judge asked Mrs. Axelson again and again how she had come to be a witness in the

---

**4.** Clark and Soleau testified to Beaty's extensive activities in planning the entire operation. Telephone records documented many phone calls between Beaty and Soleau—who were not friends. Clark, Soleau and three others testified that Beaty was on the *Tanqueray* on October 9th, Soleau, two witnesses who were on the boat, and a diver who was not involved in the conspiracy testified that Beaty participated in the first salvage attempt. Another witness who had no part in the conspiracy testified that, while he was installing sonar equipment on the *Tanqueray* for a second salvage attempt, Beaty drove up and said, "There's bales floating up on the beach. Take the boat out of the water." Two witnesses testified that they tried to fix Beaty's car because he wanted to drive the divers to New York after the second salvage attempt. A tape of a conversation between Beaty and Soleau regarding the operation was also introduced into evidence. In sum, the evidence, some of which came from uninvolved persons, strongly indicates that Beaty was deeply enmeshed in all aspects of the smuggling attempt.

**5.** For example, counsel for Ballouz called Ballouz's father as a witness. The entire direct examination dealing with the father's visit to San Francisco was transcribed in only four pages of testimony. The cross-examination took no more than one page. The court's examination, which occurred during redirect, consumed over eight pages of transcript.

**6.** At oral argument, even the government conceded that if the jury believed the testimony of the alibi witness, John Ballouz's conviction could not be sustained.

case. This lengthy cross-examination, which occupies four pages in the trial transcript, was a frontal attack on her credibility. The jury could not have helped but conclude that the judge simply did not believe Mrs. Axelson.

It is true that the judge instructed the jurors that, "I am not a partisan either way. I have no view. And you are to treat any questions put by me as though they had been put by anybody else." He also admonished them that they were the sole triers of fact and determiners of credibility. We do not believe, however, that the damaging impression created by the judge's questions was mitigated by these instructions. "[S]uch admonitions may offset [only] brief or minor departures from strict judicial impartiality." *United States v. Nazzaro*, 472 F.2d at 312–13 (quoting *United States v. Brandt*, 196 F.2d 653, 656 (2d Cir.1952)); *cf. United States v. Anton*, 597 F.2d 371, 375 (3d Cir.1979) ("Where a court has expressed its opinion on a pivotal issue in the case, and has expressed that opinion in a strong, unequivocal and one-sided fashion, abstract instructions regarding the jury's role as fact finder are not a sufficient remedy.").

The judge's overzealous examination was error. Because the evidence of Ballouz's guilt, in contrast to that of Beaty's guilt, was far from overwhelming we cannot conclude that this error did not prejudice Ballouz.[7] In such circumstances, the only remedy for the prejudice suffered by the defendant is to reverse the conviction and grant him a new trial. *See, e.g., United States v. Nazzaro*, 472 F.2d at 313; *United States v. Grunberger*, 431 F.2d 1062 (2d Cir.1970).

## IV. PROSECUTORIAL MISCONDUCT

Beaty and Ballouz also raise assorted claims of prosecutorial misconduct, the bulk of which are not sufficiently meritorious to warrant discussion.[8] They raise two claims of improper vouching, however, that must be addressed. Because of our resolution of Ballouz's case on the issue of the judge's conduct, we will consider these claims only with respect to Beaty.

Beaty asserts that the prosecutor, in eliciting from several witnesses on direct examination that they had promised to tell the truth in connection with their plea-bargain, improperly vouched for the witnesses' credibility. Whether a prosecutor may properly elicit a promise of truthfulness on direct examination is a matter of some disagreement. *Compare United States v. Edwards*, 631 F.2d 1049, 1051–52 (2d Cir.1980) ("bolstering" portions of plea agreement not admissible on direct examination); *United States v. Roberts*, 618 F.2d 530, 536 (9th Cir.1980) (promise of truthfulness not admissible on direct), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981) *with United States v. Winter*, 663 F.2d 1120, 1133–34 (1st Cir.1981) (permitting witness to testify that he was immunized in exchange for his complete and truthful testimony does not allow government improperly to vouch for witness' credibility), *cert. denied*, —— U.S. ——, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983); *United States v. Craig*, 573 F.2d 513, 519 (7th Cir.1978) (same), *cert. denied sub nom. Markert v. United States*, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 111 (1978). We have not yet addressed this issue, and find no need to do so in this case.

---

**7.** The testimony against John Ballouz consisted of the testimony of four co-conspirators and telephone toll records showing contact between Ballouz and Beaty, who were old friends. Three of the witnesses did not know Ballouz, and claim to have seen him only briefly on the evening of the rendezvous. The only witness who claimed to know Ballouz had not seen him for ten years before seeing him briefly on the night of the operation—when the witness was admittedly sick and drinking.

**8.** One of the claims of prosecutorial misconduct occurred during the prosecutor's rebuttal on

summation: "And even though we picked out what evidence we thought would bring you all the facts, we had to leave some out, even though we've been here for three weeks...." Beaty argues that this gave the jury an impression that there was even more evidence than the jury heard. Beaty objected and the objection was overruled. However, the court did give a curative instruction which we feel was sufficient to cure any prejudice that might have been occasioned by that remark.

██ Even if the admission of a promise of truthfulness on direct examination was error, it would not constitute reversible error in this case. Beaty's lawyer repeatedly emphasized the prosecution witnesses' admitted crimes and their motives for lying in his opening argument. On cross-examination, he vigorously interrogated these witnesses about their previous crimes and lies. In summation as well, Beaty's lawyer strenuously argued the witnesses' motives for lying. We agree with the Second Circuit's resolution of this problem in a similar situation:

> In view of the inevitability of defense counsels' attack on [the witnesses'] credibility and the formidable assault which in fact was made in the defense openings, cross-examinations and summations, the error in the timing of the introduction of the [truthfulness promise] does not require reversal in this case.

*United States v. Arroyo-Angulo,* 580 F.2d 1137, 1147 (2d Cir.1978), *cert. denied,* 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978).

██ Finally, Beaty argues that the prosecutor improperly vouched for the witnesses when she stated during summation that they "promised to tell the truth and they were telling the truth before the judge who will sentence them in this matter . . . ." This comment was clearly vouching and it was improper. *See, e.g., United States v. Swinehart,* 617 F.2d 336, 338 (3d Cir.1980) ("He is an honest witness" held to be vouching); *United States v. Gallagher,* 576 F.2d 1028, 1041 (3d Cir.1978) ("What motive did she have to lie . . .? There is none, because she was telling the truth." held to be vouching), *cert. dismissed,* 444 U.S. 1040, 100 S.Ct. 713, 62 L.Ed.2d 675 (1980). However, this Circuit has long distinguished between expressions of personal opinion based on the evidence and those based on facts not in evidence. *See, e.g., United States v. Gallagher,* 576 F.2d at 1042; *United States v. LeFevre,* 483 F.2d 477 (3d Cir.1973). Reversal per se is required only in the latter case. If the statements are based on the evidence, prejudice must be shown to the defendant before reversal is warranted. *United States v. Gallagher,* 576 F.2d at 1042.

This expression of opinion was clearly based on the evidence. Every witness who had plea-bargained stated on direct examination that he was aware that the trial judge would be sentencing him. After reading the record as a whole, we cannot conclude that Beaty was prejudiced by the remark. The prosecution witnesses' credibility was a hotly contested issue throughout the trial. The jury was, therefore, more likely to view this statement as an argument than as a revelation. Furthermore, after objection, the judge responded, "I heard her do no vouching. All she said was that these people have the motive to tell the truth. That's her argument. Indeed, I gather you can certainly argue that you see a motive to tell a lie. Probably you will." We do not hold up this response as a model way of dispelling any inferences which might be drawn from the prosecutor's improper remarks. Nonetheless, the response did immediately caution the jury that the prosecutor had no special knowledge of the truth, but was simply making an argument. When combined with his later instructions to the jury that arguments of counsel are not evidence, we are satisfied that the judge dispelled any improper inferences the jurors might have drawn from the prosecutor's remarks. In light of these instructions, and the overwhelming evidence of Beaty's guilt, we conclude that his trial was not prejudiced by these remarks.

## V. CONCLUSION

The conviction of defendant William Beaty will be affirmed. The conviction of defendant John Ballouz will be reversed, and his case remanded for a new trial.

## APPENDIX

Axelson—cross

THE COURT: How did you come to be a witness in this case, Ma'am?

THE WITNESS: How did I come to be an witness in this case?

THE COURT: That's what I asked you.

THE WITNESS: Because of the lawyer coming and asking me to be, which was telling the truth.

THE COURT: Oh, I see.

Was the first contact made from him to you or from you to him?

THE WITNESS: No. From the lawyer to me.

THE COURT: Did Mr. John Ballouz contact you before the lawyer did, or was it lawyer the first one?

THE WITNESS: Well, I had seen John before.

THE COURT: That isn't what I asked you, Ma'am.

THE WITNESS: I'm sorry.

THE COURT: Who first spoke to you about being a witness in this case?

THE WITNESS: Well, I think I approached them about that.

THE COURT: Oh, you approached somebody first?

THE WITNESS: Oh, yes, I managed to job. Gee, we were at the restaurant. I'd be willing to go as a witness.

THE COURT: You reached out for John Ballouz?

THE WITNESS: Yes.

THE COURT: Where was he when you reached out for him, Ma'am?

THE WITNESS: At my home.

THE COURT: He was in your home at that time?

THE WITNESS: Yes, he was.

THE COURT: Was he staying there?

THE WITNESS: No, no.

THE COURT: Was he just visiting you?

THE WITNESS: Visiting.

THE COURT: Who was he visiting there?

THE WITNESS: Me.

THE COURT: You?

THE WITNESS: Yes.

THE COURT: Not your daughter?

THE WITNESS: No. My daughter is married now.

THE COURT: When was it that he was visiting you that you mentioned to him about being a witness for him?

THE WITNESS: As I said, he always visited my home when he came to New Jersey.

THE COURT: Yes, but on what occasion was this? What month was this?

THE WITNESS: When he came home for the arraignment.

THE COURT: When was that?

THE WITNESS: The 1st of October—I don't know exactly when it was.

THE COURT: And where was he living when he came home for the arraignment?

THE WITNESS: Sausalito, California.

THE COURT: Did he stay overnight here in New Jersey, to your knowledge?

THE WITNESS: At his parents', probably. Not my home.

THE COURT: But he paid you a visit?

THE WITNESS: Yes.

THE COURT: The purpose of that was simply to come to see you?

THE WITNESS: Yes. Just to come to see us, which he always did.

THE COURT: Whenever he was in New Jersey?

THE WITNESS: Yes. Definitely.

THE COURT: When he happened to drop in you mentioned to him you could be a witness for him?

THE WITNESS: Yes.

THE COURT: Did you know the critical dates at that time?

THE WITNESS: I started from his birthday. It all sort of worked down. In the month of October it was a very specific month for me.

THE COURT: Yes, I know that you remember his birthday; is that correct?

THE WITNESS: I never forget helps birthday.

THE COURT: No. But do you also, at the time of his arraignment a year later, remember the day when the Falcon went down?

THE WITNESS: I don't know anything about the Falcon.

THE COURT: How did you know that you can be a witness for him, Ma'am, or that you would have anything useful to say?

THE WITNESS: Only that, you know—

THE COURT: I don't.

THE WITNESS: —if he was involved with this thing, how can he been there and at my home—be at the restaurant, too?

THE COURT: Be where, Ma'am?

THE WITNESS: Whatever this thing that is going with—

THE COURT: What did you know about this thing going with when you first spoke to him?

THE WITNESS: What I read in the newspaper.

THE COURT: You read it in the newspaper?

THE WITNESS: Yes.

THE COURT: Did you read the dates in the newspaper?

THE WITNESS: No.

THE COURT: Did you know what dates were important in this case?

THE WITNESS: No.

THE COURT: Did you know whether or not you could be of use to him as a witness?

THE WITNESS: Not then, really.

THE COURT: When you first spoke to him and told him that you would be a witness, did you have any idea whether you had any evidence to offer?

THE WITNESS: No. Not really.

THE COURT: All right. Thank you.